UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                CRIMINAL NO. 09-cr-00111

VERSUS                                  JUDGE HICKS

ARMARCION D. HENDERSON                  MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Defendant is charged with being a felon in possession of a firearm and ammunition. The firearm and ammunition at issue were seized during a traffic stop. Defendant was a passenger in the vehicle.

Before the court is **Defendant's Motion to Suppress. Doc. 18**. Defendant contends that the traffic stop was illegal and the evidence obtained as a result of that stop (including several incriminating statements made by Defendant) should be suppressed. For the reasons that follow, it is recommended that Defendant's Motion to Suppress be denied.

**The Facts**

An evidentiary hearing was held on September 1, 2009. The following facts were established at the hearing. On January 13, 2009, Anthony Smith, Chief of Police of Haynesville, Louisiana, was conducting routine patrol in his unmarked Chevy Tahoe.[1] When

---

[1] Chief Smith's Tahoe is equipped with emergency lights inside the grill, as well as a siren. When the emergency lights are activated, the word "POLICE" is illuminated in the top of the windshield, but the letters are in reverse order so that it can be seen and read by someone

Chief Smith was stopped at a stop sign on U.S. 79/Alternate 2, a white Ford F-150 pickup truck pulled out of a Dixie Mart convenience store and headed north on U.S. 79. Tr. 13, 80. Chief Smith turned left on U.S. 79 behind the truck. The driver of the truck was Nicholas Willis. The passenger was Defendant. Haynesville is a small town (approximate population is 3,000) and most of the occupants know each other. Chief Smith immediately recognized both Willis and Defendant Henderson.[2] The pickup truck was owned by Willis's uncle, Roger Curry.

Chief Smith noticed that the occupants of the truck looked back at him several times through the rearview mirror and the rear window. Tr. 84. The occupants appeared to be laughing. Chief Smith also observed the driver weave several times between the white fog line and the yellow center line. Tr. 12, 85-86. Chief Smith believed that the driver may have been impaired, so Chief Smith initiated his emergency lights to make a traffic stop. Tr. 12.

Despite Chief Smith's use of his emergency lights, the truck did not stop. Tr. 14. Chief Smith then activated his siren, but the truck still did not stop. Tr. 14. As the pickup truck continued to drive on, Chief Smith observed that the passenger (Defendant) acted as though he was trying to move or hide something under the seat. Tr. 17, 97.

---

looking into their rearview mirror. Tr. 10.

[2] Chief Smith knew Defendant was a convicted felon, because he had participated in the arrest of Defendant for possession of weapons, including a firearm with an obliterated serial number, in a school zone.

Chief Smith then observed the truck make several turns without using a turn signal. Tr. 18. After about two minutes with Chief Smith's light and siren active, the truck finally came to a stop.[3]

Chief Smith parked behind the truck and exited his Tahoe. He approached the driver's side window of the truck and asked the driver, Willis, why he failed to stop. Tr. 21. Willis said he did not know. While Chief Smith was standing at the driver's side door of the truck talking to Willis through the open window, he noticed a large magazine (which he associated with a semi-automatic firearm) sticking out from under the seat. Tr. 21. Chief Smith was confident that the magazine was attached to a rifle. Tr. 21, 103, 119. He directed Willis and Defendant to step outside of the pickup truck and stand in front of the Tahoe. (Unfortunately, Chief Smith's Tahoe is not equipped with a dashboard camera, so no recording was made of the encounter. Tr. 47.) Smith asked Willis for his driver's license, registration, and insurance. Willis was unable to produce a driver's license or proof of insurance.

Defendant then started to jog away from the scene. Tr. 22. Chief Smith directed him to come back, and Defendant complied.

Chief Smith entered his Tahoe to contact dispatch and determine whether Willis had a valid driver's license. Tr. 23. Dispatch confirmed that Willis did not have a valid driver's license. Chief Smith exited his Tahoe and again approached Willis and Defendant. At that

---

[3] Defendant introduced a video of the route taken by the truck. Defendant Exhibit 8. The video shows the route took approximately two minutes.

point, Willis started to run from the scene. After running 15 to 20 yards, Willis stopped, turned around, and looked back at Chief Smith as if to say "aren't you going to run after me?" Chief Smith told Willis to stop, but Willis continued to run. Tr. 24-25. Chief Smith did not pursue Willis, because Defendant was unrestrained and Chief Smith knew (because he saw the magazine) that a semi-automatic firearm was located inside the pickup truck.

Assistant Chief of Police Jason Branch arrived on the scene to provide back-up to Chief Smith. Defendant was handcuffed and placed in the back seat of the Tahoe. Chief Smith opened the passenger door of the truck and removed the rifle. The rifle was identified as an SKS Model MAK-90 Sporter, 7.62 x 39 caliber. Photographs of the rifle were introduced into evidence as Government Exhibit 1-A and 1-B. The large magazine attached to the rifle contained 19 rounds of ammunition. One round was in the chamber of the rifle.

Defendant went to considerable lengths at the hearing to try to prove that Chief Smith could not have seen the rifle in plain view through the driver's side window of the pickup truck because the rifle was wrapped in clothing and concealed under the seat of the pickup truck. However, the credible evidence does not support that contention. Instead, the evidence shows that the rifle was placed partially under the seat of the pickup truck because it would not fit all the way under the seat. Tr. 217, 237.[4] Even Willis, the driver, admitted

---

[4] The rifle was positioned in the truck so that the butt of the rifle was under Defendant's legs and the muzzle or barrel of the rifle was under Willis's legs. Tr. 103-104. The bottom six inches of the magazine were visible to Chief Smith as he talked with Willis through the driver's side window. Tr. 137-138. Chief Smith did not see the rifle at that time; he only saw the

during his earlier grand jury testimony that the rifle was sticking out "a little bit" from under the seat. Tr. 231. Additionally, no clothing (which could have been used to conceal the rifle) was found during the inventory that was conducted at the scene before the truck was impounded.

After the rifle was removed from the truck and secured, Chief Smith told Defendant that he was under arrest for being a felon in possession of a firearm. Chief Smith read the <u>Miranda</u> warnings card (Govt. Ex. 2) to Defendant. Defendant appeared to understand his rights, and he told Chief Smith that he would "take the charge." Tr. 35, 40.

Because the driver could not produce proof of insurance, Chief Smith contacted a towing company to impound the truck. Tr. 35. Before the truck was towed, Chief Smith conducted an inventory of the truck's contents. Only two items were found during the inventory: A box of Cheerios cereal and Willis's mother's purse. Had the rifle not been discovered earlier, it certainly would have been discovered when the inventory was conducted.

Defendant was transported a short distance to the Haynesville Police Department for processing. At the police department, Chief Smith again advised Defendant of his rights. Tr. 142. Defendant also signed two forms indicating that he had been advised of his rights. Govt. Exs. 3 and 4. When the undersigned pointed out at the hearing that boxes had been checked on Exhibit 3 indicating that Defendant did *not* understand his rights and was not

---

magazine. Tr. 104.

willing to answer questions without a lawyer, Chief Smith explained that those were typographical or computer errors. Tr. 45, 111. The wrong boxes were checked before Defendant signed the form. The "Yes" box – the correct box – was checked on Exhibit 4.

During a brief conversation with Agent Adrian Malone at the Police Department, Defendant told Malone that he was already a convicted felon and was willing to accept responsibility. Tr. 51, 157. Defendant asked Agent Malone if they could make a deal so that Defendant could "work off" the charges by cooperating on other matters.

After processing, Defendant was transported to the Claiborne Parish Detention Center. During transport, Defendant asked Chief Smith: "Big Ant, would you tell me who ratted me out?"[5] Chief Smith responded that no one had told on him.

**Standing**

All occupants of a vehicle generally have standing to challenge the validity of a traffic stop. United States v. Jones, 2009 WL 3199650 (5th Cir. 2009). But not all occupants have standing to contest the validity of a search of the vehicle. A defendant has standing to contest the validity of a search if a two-pronged test is met: (1) the defendant must "establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized"; and (2) "that expectation of privacy [must be] one which society would recognize as reasonable." United States v. Kye Soo Lee, 898 F.2d 1034, 1037-38 (5th Cir.1990). "Typically, a passenger without a possessory interest in an automobile lacks

---

[5] Chief Smith's nickname is Big Ant. Defendant's nickname is Big Bird. Tr. 50, 111.

standing to complain of its search because his privacy expectation is not infringed." United States v. Roberson, 6 F.3d 1088, 1091 (5th Cir.1993); United States v. Jones, 2009 WL 3199650 (5th Cir. 2009); United States v. Short, 181 F.3d 620, 624 (5th Cir. 1999).

All of the evidence indicates that Defendant was only a momentary passenger in the truck owned by Willis's uncle, Roger Curry. Defendant had no ownership or possessory interest in the truck, and he had no reasonable expectation of privacy with regard to the truck or its contents. Accordingly, Defendant lacks standing to complain about the search of the truck and/or the seizure of the rifle. The key issue, therefore, is the legality of the initial stop.

**Legality of the Traffic Stop**

**The Initial Stop**

Defendant argues that the traffic stop that led to his arrest was illegal. More specifically, Defendant argues that Chief Smith had no information that Willis or Defendant was guilty of any criminal activity at the time Chief Smith turned onto Highway 79 behind Willis's truck. Defendant argues that the alleged weaving – or any other traffic violation – never took place. Essentially, Defendant asks the court to find the testimony of Chief Smith is less believable than that of Willis.

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must

determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981).

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006). Thus, an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146, 153 (2004). See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....").

As for the second prong of the <u>Terry</u> inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." <u>Brigham</u>, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. <u>Id</u>. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. <u>Id</u>. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which <u>Terry</u>'s second prong is aimed." <u>Id</u>.

The court finds no basis to discredit Chief Smith's testimony that he initiated the traffic stop because the truck was weaving along U.S. 71 and he believed the driver may have been impaired. That testimony is consistent Chief Smith's other testimony that Willis and Defendant looked back at Chief Smith several times while laughing. Once Chief Smith activated his emergency lights, Willis did not stop the truck; instead, he continued driving and, in the process, committed additional traffic violations. Thus, the credible evidence shows that the initial stop was justified at its inception.

**Discovery of the Rifle**

The discovery and seizure of the rifle was not the result of a prolonged detention. When Chief Smith approached Willis's driver's side window, he saw the large magazine sticking out from under the seat of the truck. Therefore, probable cause was developed

immediately upon Chief's Smith contact with Willis at the driver's side window. Chief Smith believed, as any reasonable officer would, that the magazine was attached to a semi-automatic rifle. Chief Smith knew that Defendant was a convicted felon and could not legally possess a firearm. When Chief Smith saw the magazine sticking out from the under seat in close proximity to Defendant, he had probable cause at that moment to arrest Defendant and to search the truck. The behavior of Willis (he ran from the scene and did not return) further supports a finding of probable cause to search the truck.

**Other Justifications for Seizing the Firearm**

The Government offers several alternative justifications for upholding the seizure of the firearm: the rifle was in plain view; the rifle would inevitably have been discovered by Chief Smith as part of the inventory/impound process; and exigent circumstances existed to permit seizure of the rifle. Because Defendant lacks standing to challenge the search of the truck and the seizure of the rifle, the court need not reach those alternative arguments.

**Defendant's Statements**

Defendant made several incriminating statements to Chief Smith and Agent Malone that he would "take the charge." The evidence shows that those statements were freely and voluntarily made.

A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching either by direct coercion or subtle psychological persuasion. U.S. v. Bell, 367 F.3d 452, 460-461 (5th Cir. 2004); U.S.

v. Mullen, 178 F.3d 334, 341 (5th Cir. 1999).  The statement must be voluntarily, knowingly and intelligently made, and the individual confessing must be cognizant of the rights being abandoned and the consequences of doing so.  U.S. v. Santiago, 410 F.3d 193, 202 (5th Cir. 2005).

When the defendant challenges the voluntariness of his confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at trial.  U.S. v. Clay, 408 F.3d 214, 221 (5th Cir. 2005).

Voluntariness is evaluated based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation.  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). See also U.S. v. Barlow, 41 F.3d 935 (5th Cir. 1994).  Factors include the age of the accused, his intelligence and education, advice regarding his constitutional rights, length of detention, repeated and prolonged nature of the questioning and whether physical punishment such as deprivation of food or sleep was imposed.  Id.  No case turns on the presence or absence of a single factor.  Id.

While Defendant was in custody at the time of his statements, the evidence shows that he was not under any duress or coercion.  He was advised of his rights multiple times, both orally and in writing, and he appeared to understand his rights.  Tr. 35, 40-43.  The court is satisfied from the testimony of Chief Smith that the "No" boxes that were checked on one of the rights forms (Govt. Ex. 3) were computer (typographical) errors by Chief Smith.

Tr. 44-45. Defendant's actions indicated a voluntary waiver of his rights, and his statements were freely and voluntarily made.

**Credibility**

In his supplemental brief, Defendant states that "[l]egal issues will not decide this case. It is a determination as to the credibility of the witnesses who testified and the conclusion as to how inconsistent reports are to be resolved that will determine its outcome." Defendant's Supplemental Brief, p. 9. It is true that the report (Defense Ex. 6) prepared by ATF Agent T.J. Boddie is substantially different regarding the circumstances of Chief Smith's discovery of the rifle. However, it was explained at the hearing that Agent Boddie was not on the scene of the traffic stop and his report is based on second-hand information. More significantly, the reports prepared by Chief Smith (Defense Exs. 2, 4 & 5) are substantially similar with regard to the material facts of the encounter – why the traffic stop was made and how/when the rifle was discovered.

Other discrepancies raised by Defendant to cast doubt on Chief Smith's credibility include whether Chief Smith was in street clothes or in uniform (the evidence shows he was wearing a polo-style shirt with his name and badge on it); whether Chief Smith was wearing flip-flops (he was not); whether Chief Smith said later that he stopped the truck for loud music (he did not); whether Chief Smith raised his voice when he approached Willis's truck window (he probably did); whether Chief Smith was acting on a tip from Mookey Jackson (he was not); whether the rifle was wrapped up in a sweater (it was not); and whether

Chief Smith was driving "faster than normal" on Highway 79 shortly before he encountered the truck driven by Willis (he was not). Defendant's credibility arguments are not persuasive. Having observed the witnesses in person, the undersigned finds the testimony of Chief Smith is far more credible than the contrary testimony of Ms. Green, Willis, Defendant's mother, and Defendant's sister.

**Conclusion**

There is no basis to suppress the evidence in this case. The rifle and ammunition were found pursuant to a valid traffic stop by an officer who knew that Defendant could not legally possess a firearm. Furthermore, Defendant's statements were freely and voluntarily made.

Accordingly;

IT IS RECOMMENDED that Defendant's Motion to Suppress (Doc. 18) be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **seven (7) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 5th day of January, 2010.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE